MARK H. McKINSEY AND VANESSA V. McKINSEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McKinsey v. Commissioner
Docket No. 11500-80.
United States Tax Court
T.C. Memo 1984-514; 1984 Tax Ct. Memo LEXIS 160; 48 T.C.M. (CCH) 1225; T.C.M. (RIA) 84514; September 26, 1984. *160 Held, petitioners are not entitled to deduct under section 162 or section 212, I.R.C. 1954, certain expenditures made with respect to their residence, which they previously had held as rental property. Held further, petitioners are entitled to a depreciation deduction on their residence while it was held as rental property for four months in 1977, computed by using the straight-line method of depreciation, a $90,000 purchase price, and a 30-year useful life. Held further, petitioners are entitled to depreciate 40 percent of their basis in their BMW automobile, computed by using the straight-line method of depreciation, and a 3-year useful life. Held further, petitioners are entitled to take 40 percent of their BMW automobile into account for purposes of determining the amount of allowable investment tax credit. Robert A. Jacobs and Claudia Alston, for the petitioners. Geraldine R. Eure, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In a notice of deficiency, dated April 1, 1980, respondent determined a deficiency in petitioners' Federal income tax of $12,176.96 for the taxable year 1977. After concessions by the parties, the primary issues *161 remaining for decision are: (1) Whether petitioners are entitled to deduct under section 162 or section 212, I.R.C. 1954, certain expenditures made with respect to their residence, which they previously had held as rental property. (2) Whether petitioners are entitled to a depreciation deduction on their residence while it was held as rental property in 1977 in excess of the amount allowed by respondent. (3) Whether petitioners are entitled in 1977 to a depreciation deduction and an investment tax credit on their BMW automobile. GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. At the time they filed their petition in this case, Mark H. McKinsey and Vanessa V. McKinsey, husband and wife, resided at 91 Benedict Hill Road, New Canaan, Connecticut. Petitioners filed a joint Federal income tax return for the taxable year 1977 with the Internal Revenue Service Center, Fresno, California. They computed their taxable income for that year using the cash basis method of accounting. Petitioners' House
FINDINGS OF FACT In 1972 Mrs. McKinsey purchased *162 petitioners' home, located at 91 Benedict Hill Road, New Canaan, Connecticut, for $120,000. The house had been built in 1938 and was situated on 2.609 acres of land. In August 1972, prior to Mrs. McKinsey's purchase of the house, Parsons Bromfield and Redniss, Consultants and Engineers, inspected the house and prepared a "Prepurchase House Inspection Check List." Among the findings made in the foregoing report were that the walls were in good condition; the exterior paint was fair, with some blistering; the roofing material was in good condition; the gutters were in fair condition, but needed cleaning; and some of the drains used to dispose of roof water were clogged. The report notes as potential maintenance problems: "Small problems such as painting of window sills, repairing leaky washers, cleaning gutters are manditory [sic]." The report further states as follows: House generally in good condition. Basic structure is good, with no evidence of deterioration.Plumbing * * * adequate but not in best condition. Bathrooms while of good quality (tile walls, some with ceramic tile floors) are dated by their fixtures. In 1974 petitioners moved from Connecticut to California and began *163 renting their Connecticut home to a Mr. and Mrs. Bergman. Petitioners rented the house to the Bergmans from June 1974 until the end of April 1977. During 1977 the monthly rental for the house was $750. A lease agreement entered into between petitioners and the Bergmans in August 1976 called for a prepayment of 2 months' rent. In 1977 the Bergmans actually paid rent of only $1,500. During the period from November 1976 through February 1977, the New Canaan, Connecticut area experienced less precipitation than usual with the departure from normal for those months being -3.47, -.85, -.28, and -.97 inches, respectively. In March 1977, a total of 7.74 inches of rain fell on the New Canaan, Connecticut area, which was 4.25 inches greater than normal. On March 22, 1977, 4.20 inches of rain fell on the the New Canaan, Connecticut area, which was the greatest 1-day precipitation recorded in New England during the month of March 1977. In addition, the New Canaan area experienced 58-mile-per-hour winds at some time during March 1977. Again, In April 1977 the New Canaan, Connecticut area experienced above normal precipitation, Specifically, it experienced a total of 3.60 inches of rain, *164 a departure of .21 inches from normal. In addition, the area experienced 39-mile-per-hour winds at some time during April 1977. In late May 1977, about a month after the Bergmans had vacated petitioners' New Canaan home, petitioners moved back from California to New Canaan and resumed occupancy in their residence, where they continued to reside until 1981. The parties have stipulated that the fair market value of the New Canaan property during the period January 1977 through May 1977 was not less than $120,000. Upon return to their New Canaan residence, petitioners discovered that the outside shutters on the house were missing, that roof shingles were lying around the front yard, and that the exterior paint was blistering on the front and down one side of the house. On the interior of the house, petitioners found that the ceiling in the dining room "was sagging and full of water"; that there were bad water stains on the ceiling and walls of the entry hallway and on the plastered walls in the bathrooms; and that some of the tiles in the upstairs bathrooms had become dislodged from the walls. In addition, petitioners found that there was water standing in the floor in the kitchen *165 and that the wall between the kitchen and the garage had "fallen out" in an area of about 2 feet by 1-1/2 feet. Shortly after petitioners returned to New Canaan, they contacted Harry Peck, a contractor in the Stamford, Connecticut area, and retained him to inspect the damage to their home and to perform services with respect thereto. When Mr. Peck arrived at petitioners' home he found "a lot of leaks," which in his opinion were caused by "the storm, wind and rain, the water getting into the house, going down through the walls." Mr. Peck checked the roof of the house and found that a large number of the shingles hadbeen torn off as a result of wind and rain. He also found that some of the shutters were lying on the ground. Mr. Peck later concluded that, as a result of the roof damage, water had accumulated in the walls of the house. In Mr. Peck's opinion, some of the walls had held water for just a couple of weeks and others, for up to 3 years. Following his inspection, Mr. Peck set out to perform a variety of services. [1] First, he repaired the roof by replacing substantial parts of it. He tarred the copper gutters, which contained pinholes and replaced copper downspouts, which *166 also contained pinholes. According to Mr. Peck, the pinholes were a result of a chemical reaction between the wood shingles and the copper, which had occurred over a period of 25 to 30 years. Mr. Peck also replaced the old valleys in the roof and three dormer garage valleys.He renailed the siding and replaced the shutters on the house. He replaced the cornice over a screened porch. According to Mr. Peck, the cornice had rotted as a result of storms over a period of some time. Mr. Peck performed extensive work on the interior of the house as well. He took down the plaster dining room and hall ceilings and replaced them with drywall, a material that, according to Mr. Peck, is less expensive than plaster and not of as fine a quality. Because he was unable to match the buckled tiles in the bathroom, Mr. Peck stripped all of the tile work and entirely retiled two bathrooms. In order to retile the bathrooms, he had to remove all of the fixtures except the bathtubs. The retiling process included tiling *167 around the tub, tiling the ceiling, tiling a shower stall, grouting a bathtub, replacing a lead shower pan, and installing a new shower valve. Petitioners had purchased new vanity units, which Mr. Peck installed instead of the old washbasins once he finished the retiling. According to Mr. Peck there was no extra charge for installing the new vanities. Mr. Peck also enclosed one of the bathtubs. In addition, Mr. Peck replaced a kitchen wall and garage wall, which, according to Mr. Peck, had suffered water damage as a result, in part, of "an old leak and [in] part from the last storm * * *." He found that the studs in the old walls had "deteriorated" over an approximately 3-year period. Mr. Peck also freed a few windows in the kitchen that were stuck from condensation and did some other miscellaneous work in the kitchen. He replaced the glass in one of the windows and installed a board under one of the sliding doors. Petitioners hired Anthony Bocchetta, a carpenter, to work on the area under the laundry and the cabinets above the laundry, to build some bookshelves, to fill a crack in a door, to replace three broken glass panes, to replace two damaged screen sections, to rescreen *168 the entire porch, and to remove a broken storm door. Petitioners hired Howard B. Toms, Tree Surgery, Inc., to cut back and trim the shrubs and bushes adjacent to the house. According to petitioners, such work was necessary to provide the painters unencumbered access to one part of the house and to remove branches that had been partially broken by storms. Petitioners hired Sherwood & Bauer, Inc. to paint the exterior of the house, two upstairs bedrooms, the dining room ceiling, hallway ceilings, walls and trim on all three floors of the house, a bathroom, the new wood on the house and the new shutters. Sherwood & Bauer also papered one of the bathrooms. According to petitioners, the entire exterior of the house and not just the damaged areas had to be repainted, because the painters did not believe that they could "match exactly the color." Petitioners purchased new shutters and hardware for the shutters from Weed & Duryea Co., a local lumberyard and hardware store. They purchased wallpaper from L. Brandman & Sons, Painters. Petitioners hired Modern Plumbing & Heating to repair leaks in the bathroom plumbing joints. Petitioners received invoices from the following persons and in *169 the following amounts for work done on their New Canaan residence in 1977: 5/07/77
Anthony Bocchetta, Repairman
$778.00
8/24/77
Howard B. Toms, Tree Surgeon
542.00
9/15/77
Sherwood & Bauer, Inc., Painters
4,667.00
12/12/77
Sherwood & Bauer, Inc., Painters
1,384.00
9/24/77
Weed & Duryea, Painters
171.80
10/24/77
Weed & Duryea, Painters
6.96
11/25/77
Weed & Duryea, Painters
93.00
11/07/77
Modern Plumbing
101.00
11/09/77
Harry Peck, Builder
8,343.14
1/12/78 [2]
Harry Peck, Builder
32.00 Petitioners do not have canceled checks evidencing payment of the October 24, 1977 and November 25, 1977 invoices of Weed & Duryea, Painters. According to Mr. McKinsey, petitioners paid these items in cash. Petitioners also do not have a canceled check evidencing payment of the January 12, 1978 invoice of Harry Peck, Builder, which included a balance of $1,843.14 from the November 9, 1977 invoice, as well as the $32 amount listed above. However, a notation on the January 12, 1978 invoice states that the full amount was paid on December 30, 1977, and both Mr. McKinsey and Mr. Peck testified that the full amount was paid in 1977. In addition, petitioners claim that they paid $58 in cash to L. Brandman & Sons in 1977 for the wallpaper. *170 Petitioners' house was insured against water damage in 1977. In July 1977 petitioners notified their insurance company that there was water damage to their house. They estimated that the cost of the loss was in excess of $1,100. The insurance company sent a claims adjuster to the house to examine the damage. The insurance company reimbursed petitioners $949 for water damage in 1977 and $720 for tile repair in 1978. On their schedule A attached to their 1977 tax return, petitioners deducted $15,128 as a casualty loss. Petitioners arrived at this figure by subtracting from the total cost of the services performed on the house ($16,177), the insurance proceeds paid in 1977 ($949) and the $100 nondeductible casualty loss floor. In his notice of deficiency, respondent disallowed the casualty loss in its entirety. OPINION On brief, petitioners state that they are no longer pursuing a casualty loss deduction under section 165. Instead, petitioners contend that the work performed on their *171 house in 1977 constituted repairs and that unreimbursed repair expenses in the amount of approximately $15,030 were ordinary and necessary expenses, deductible by them under section 162 or section 212. In addition, although petitioners did not so claim on their 1977 return, they now claim that they are entitled to a depreciation deduction with respect to the operation of their New Canaan home as rental property during January through April 1977. Respondent, on the other hand, contends that the expenditures in question were not incurred in carrying on a trade or business within the meaning of section 162 or paid or incurred for the production or collection of income or for the maintenance or conservation of property held for the production of income within the meaning of section 212. Respondent also contends that the expenditures were personal or capital in nature and, therefore, expressly nondeductible under section 262 or section 263. Respondent asserts that, in the event that the Court should determine that petitioners are entitled to a deduction for the expenditures, they have not substantiated payment in 1977 of the entire amount claimed.Respondent finally contends that petitioners *172 are not entitled to a depreciation deduction on their house in 1977 in excess of $500. [3] We turn first to the issue of whether petitioners are entitled to deduce any part of the expenditures in question under section 162 or section 212. [4]
Section 162 allows a deduction for all the "ordinary and necessary expenses" paid or incurred during the taxable year "in carrying on any trade or business." Section 212 allows a similar deduction *173 for all the "ordinary and necessary expenses" paid or incurred "for the production or collection of income" or "for the management, conservation, or maintenance of property held for the production of income." Section 262, on the other hand, expressly denies a deduction for personal, living, or family expenses. Moreover, section 263(a) expressly denies a deduction for any amount paid for permanent improvements or betterments which increase the value of the property or for any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made. Petitioners herein assert that the large bulk of their expenditures was made to restore their property to its condition prior to damage and that, therefore, the expenditures are currently deductible "repair" expenses. Respondent believes, instead, that the "repairs" were actually permanent improvements, betterments, or replacements and that, therefore, the expenditures were capital in nature and not currently deductible. We have discussed on innumerable occasions the demarcation between currently deductible repairs and depreciable capital expenditures. See, e.g., Coors v. Commissioner,60 T.C. 368, 403-404 (1973), *174 affd. 519 F.2d 1280 (10th Cir. 1975); Plainfield-Union Water Co. v. Commissioner,39 T.C. 333, 337-341 (1962); Trustee Property No. 4 v. Commissioner,21 B.T.A. 627, 629 (1930); Potter v. Commissioner,20 B.T.A. 252, 254 (1930); Illinois Merchants Trust Co. v. Commissioner,4 B.T.A. 103, 105-107 (1926). Although it is an easy enough task to describe in abstract terms that line of demarcation, applying that line in a particular factual context, at times, can prove exceedingly difficult. Such would be true in the instant case. However, we do not have to decide whether the expenditures were for repairs or capital improvements because that decision would not alter our ultimate decision that the expenditures in question are not deductible under section 162 or section 212 regardless of their classification. The critical question in this case, and the one we find dispositive, is not whether the expenditures should be classified as ordinary and necessary expenses, on the one hand, or capital expenditures, on the other, but whether even assuming a non-capital classification, they were paid or incurred in carrying on a trade or business or were paid or incurred for the production or collection *175 of income or for the conservation or maintenance of property held for the production of income. Clearly, had petitioners made similar expenditures at a time when they intended to continue holding the property as rental property, the foregoing issue would not be an issue at all. Instead, the critical issue then would be whether the expenses were ordinary and necessary or capital in nature. As the facts exist, however, petitioners incurred the expenditures in question after they had converted the New Canaan property into their own personal use and were no longer holding it in a trade or business or for the production of income. Petitioners acknowledge that the expenditures were made after the property ceased being held as rental property, but assert that the expenditures are nonetheless deductible because they were made necessary as a result of having held the property as rental property. An expense, otherwise deductible under section 162 or section 212, may remain so even though the business or the income-producing activity out of which it arose has since terminated.See, e.g., Kornhauser v. United States,276 U.S. 145 (1928); Flood v. United States,133 F.2d 173, 178-179 (1st Cir. 1943); *176 Dowd v. Commissioner,68 T.C. 294, 301-302 (1977); Burrows v. Commissioner,38 B.T.A. 236, 238 (1938). However, deductibility in such a situation is premised on a showing that the expenses sought to be deducted are directly connected with or proximately resulted from the taxpayer's since-terminated business or income-producing activity. Kornhauser v. United States,supra at 153; Flood v. United States,supra at 178. Petitioners herein have not established by the preponderance of the evidence that the expenditures in question were directly connected with or proximately resulted from their since-terminated business or income-producing activity. The evidence before us reveals that, in 1972 Mrs. McKinsey purchased petitioners' home, which had been built in 1938. Ancillary to that purchase, petitioners procured an inspection report, which, although generally favorable, did note some problems with the exterior paint, the gutters, the drains, and the plumbing. Approximately 2 years thereafter, in June 1974, petitioners began renting their home to the Bergmans, who continued renting until the end of April 1977. The evidence also reveals that, although the New Canaan area experienced less *177 than normal precipitation during November 1976 through February 1977, it experienced above normal precipitation in March and April 1977, the last 2 months of the Bergmans' tenancy. In addition, the New Canaan area experienced heavy winds at some time during those 2 months. Petitioners moved back to their New Canaan home at the end of May 1977, approximately 1 month after the Bergmans had vacated, whereupon they discovered water damage to their home. It is not unlikely that some of the damage became manifest while the property was being held as rental property, and no doubt the damage was aggravated by the abnormal weather conditions during the last 2 months that the property was held as rental property. [5] We nevertheless do not believe that the evidence establishes that the damage was fairly attributable to petitioners having held the property as rental property.Damage, such as that described by petitioners, is generally a gradual process, and we are unable to determine on the record before us that the damage arose out of petitioners' rental activity, other than as a result of ordinary wear and tear for which a depreciation deduction is already allowable, or even that its period *178 of occurrence can be confined to the period of the Bergmans' tenancy. Thus, we cannot say that the expenditures made in response to that damage were made necessary as a result of the operation of the property as rental property. Mr. Peck, inhis testimony, estimated that all but $1,000 of his charges was attributable to water damage. He initially indicated that most of the damage had occurred within an approximately 3-year period. Mr. Peck's other testimony, however, suggests that the damage was a gradual process, occurring over an indefinite period of time. Thus, for example, when questioned with respect to why the siding had fallen off the house, Mr. Peck explained that the nails had popped as a result of moisture over a period of "so many years." He explained *179 that the pinholes in the gutters were a result of a chemical reaction between the wood shingles and the copper over a period of "25, 30 years." Similarly, he testified that the pinholes in the downspouts were caused by "a chemical reaction--wood shingles and the copper and after a while all that--it's just a wear, that's what it is." He testified that damage to the kitchen wall and the garage wall was caused in "part from an old leak and [in] part from the last storm * * *. It was more noticeable then because it leaked in a lot more and it came onto the kitchen floor." Mr. Peck also testified that the cornice had rotted as a result of previous, as well as recent, storms. With respect to the shingles that had blown off the roof, Mr. Peck acknowledged that the damage could have occurred over a period of time, "15 or 20 years." To the extent that the damage in question was in part attributable to gradual deterioration, the situation presented herein is similar to that considered by us long ago in Page v. Commissioner,1 B.T.A. 400 (1925). There, the taxpayer built a house in 1910, which he used as his personal residence until 1917. The house was constructed of shale brick and stucco *180 finish. In 1917, the taxpayer began leasing the property to a tenant. The property was leased for a period of about 3 years. During the tenancy, and due to weather conditions, nearly all of the stucco finish on the exterior of the house fell off. No decorating or painting had been done to the interior of the building during the tenancy or for a number of years prior thereto. Anticipating his reentry into possession, and during the time of the tenancy, the taxpayer restuccoed the exterior of the house and repainted and redecorated the interior. The taxpayer moved back into the house at the end of the tenancy. He deducted, as repairs, the expenses incurred for stucco work, repainting, and redecorating. He also took a deduction for wear and tear. The issue presented was whether these expenditures were ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. In answering that question in the negative, we observed: [C]an we consider that the replacement of the stucco and the repainting and redecorating of the interior were ordinary and necessary expenses paid in carrying on the trade or business of renting houses or a house? *181 The wear and tear had extended over a period of probably ten years, during most of which time the taxpayer was in possession, and in only three of which years the property was leased for income purposes. At the time the restoration work was decided upon and begun, the taxpayer had no intention of renting the property for any further period and was doing the work for his own use. Deterioration of property, such as is described in the facts before us, is a gradual process. While the stucco may have fallen off in one year, the cause of its disintegration ran from year to year from the date that it was put on the house. We know that the taxpayer had taken allowance for wear and tear * * * for at least two years * * *. The conceded amount of deductions * * * is * * * the probable reasonable pro rata for wear and tear for the two years involved * * *. We believe therefore that this appeal is governed by section 215(c) of the Revenue Act of 1918, which prohibits deductions for "any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made." Furthermore, it may well be said that, as the house was being restored for the personal *182 residence purposes of the taxpayer, the expenditures were personal and not deductible * * *. The amounts spent were properly capital or personal expenditures. [1 B.T.A. at 402.] [6] Similarly, in the instant case as we have stated, the evidence leads us to conclude *183 that the damage to petitioners' home, although no doubt aggravated by abnormal weather conditions during the last 2 months of the Bergmans' tenancy, resulted from gradual deterioration. To the extent petitioners have attempted, by implication, to attribute the damage solely to the weather conditions of March and April 1977, we do not believe that the evidence supports them. Mr. Peck's overall testimony certainly would belie petitioners' contention in that respect. Further, Mr. McKinsey himself alluded in his testimony to the fact that the realtor who had been handling the lease had inspected the house in January or February of 1977 and had discovered some water damage to the kitchen wall. We hold that petitioners have not established that their expenditures were necessitated by damage, beyond normal wear and tear, that occurred during the rental period. We, therefore, conclude as we did in Page v. Commissioner,supra, that the expenditures made by petitioners were personal in nature. The remaining issue for decision with respect to petitioners' New Canaan home relates to the amount of the allowable depreciation deduction for 1977. Petitioners contend that they are entitled to *184 a depreciation deduction in 1977 in the total amount of $3,200. Petitioners arrive at the $3,200 figure by using the straight-line method of depreciation and a 10-year useful life in 1977, by allocating 20 percent of the $120,000 total purchase price of the New Canaan property to the land, and by taking depreciation for 4 months of the 1977 year. In the alternative, petitioners contend that should the Court determine that the property had a useful life of 20 years or more when it was placed in service, they are entitled to use the 125-percent declining balance method of depreciation. Respondent does not dispute that petitioners are entitled to a depreciation deduction. However, he had determined that they are entitled to a depreciation deduction of only $500 in 1977. Section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for exhaustion and wear and tear of property used in a trade or business or held for the production of income. It is respondent's first contention that the New Canaan property was held as rental property for only 2 months during 1977 and thus that the property qualified as property subject to a depreciation deduction *185 for only 2 months of that year. While the record is not as clear as it might be with respect to the date on which the Bergmans vacated the New Canaan property, we have concluded and have so stated in our findings of fact, that the Bergmans rented the property for 4 months in 1977. Respondent's reliance on the amount of rent reported by petitioners in 1977 to support his contention that the property was held as rental property for only 2 months in 1977 is misplaced. As previously stated, the Bergmans paid rent of $750 per month. Petitioners reported total rent received in 1977 of $1,500. The lease agreement between petitioners and the Bergmans called for a 2-month prepayment of rent. Petitioners' explanation that the last 2 months' rent was paid prior to 1977, at the start of the lease, is in accord with the terms of the lease. Thus, we conclude that the property was held as rental property for 4 months in 1977 and that petitioners are entitled to 4 months' depreciation on the house during that year. It is respondent's second contention that the useful life of the New Canaan property as rental property was 30 years. The petitioners, however, have asserted that the property had *186 a useful life of only 10 years. Section 1.167(a)-1(b), Income Tax Regs., provides that the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period of time over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. Petitioners have offered no evidence to support their determination that the property had a 10-year useful life. The only clue we have with respect to how petitioners arrived at such a determination is a statement on brief to the effect that "[a]ssuming the house built in 1938 had at that time a useful life of 49 years, in 1977 it would have a remaining [useful] life of 10 years." As respondent points out, however, section 1.167(a)-1(b), Income Tax Regs. , in effect, contemplates that useful life be determined as of the time petitioners' house became rental property and not as of the time the house was built. The record in this case does not permit us to hold that respondent's determination of a 30-year useful life is erroneous. While we have no evidence why respondent determined that the useful life to be used in depreciating the house *187 was 30 years, respondent's determination is presumed to be correct and petitioners have not presented any evidence to overcome that presumption or to give us any basis for making an independent determination of the useful life of the house. [7]
Respondent's third contention relates to the allocation of the $120,000 total purchase price of the New Canaan property between the depreciable realty and the nondepreciable land on which it stood. Section 1.167(a)-5, Income Tax Regs., provides in part that in the case of the acquisition of a combination of depreciable and nondeprecible property for a lump-sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. In the instant case, Mrs. McKinsey paid a total of $120,000 for the New Canaan property, which included the depreciable house and the nondepreciable 2.609 acres of land on which it was situated. There being no specific sum allocated to either asset, it is necessary to allocate the lumpsum *188 purchase price among those assets inorder to determine the proper basis for depreciation of the depreciable asset. Respondent contends that $30,000 of the purchase price should be allocated to the land, whereas, petitioners contend that only 20 percent of the purchase price should be allocated to the land.Petitioners have not presented the Court with any evidence to support their allocation other than Mr. McKinsey's statement at trial that he would allocate $20,000 to land because he though that was what "land was selling for at the time." There is nothing in the record to indicate that Mr. McKinsey had any expertise in real estate appraisal. Nor is there anything in the record to indicate that he even had any knowledge concerning a specific sale of land in the New Canaan area. Where the Commissioner has made an allocation for the purpose of computing depreciation, the allocation is presumptively correct.Petitioners have failed to present any evidence to overcome respondent's allocation. We must, therefore, sustain that allocation. Finally, respondent contends that petitioners are not entitled to use the 125-percent declining balance method of depreciation pursuant to section 167(j)(5), *189 as claimed in the alternative by petitioners. Respondent does not dispute that this method is an appropriate method to use in the case of used residential rental property with a useful life of at least 20 years. However, he asserts that petitioners have not proven their "unrecovered cost or other basis" in the property within the meaning of section 1.167(b)-2, Income Tax Regs.
The foregoing section of the regulations provides that, under the declining balance method, a uniform rate is applied each year to the unrecovered cost or other basis of the property. If further provides that the unrecovered cost or other basis is the basis provided by section 167(g) adjusted for depreciation previously allowed or allowable, and for all other adjustments provided by section 1016 and other applicable provisions. Respondent points out that there is nothing in the record from which we could determine petitioners' basis in the property as adjusted for depreciation previously allowed or allowable in 1974, 1975 and 1976, while the property was being held as rental property and that, therefore, petitioners may not use the 125-percent declining balance method of depreciation. We must agree with respondent *190 that petitioners' utter failure of proof precludes their use of the 125-percent declining balance method of depreciation. In sum, we sustain respondent's determination that petitioners may use only the straight-line method of depreciation in 1977, computed by allocating $90,000 of the $120,000 total purchase price of the property to the depreciable realty and by taking into account a 30-year useful life. On the other hand, we reject respondent's determination that petitioners may depreciate the rental property for only 2 months in 1977 and conclude, instead, that they may depreciate the property for 4 months during that year. Petitioner's Automobile
FINDINGS OF FACT On April 1, 1977, while petitioners were still residing in California, Mr. McKinsey entered into a 4-year open-ended lease agreement with First Leasing Corporation for a 1977 BMW automobile. The terms of the agreement required an initial $6,325 payment and 47 monthly payments of $301.09 each. Mr. McKinsey paid First Leasing Corporation a total of $8,849 in 1977.At the time Mr. McKinsey entered into the lease agreement, he expected to retain the BMW for the term of the lease, to use it in his business for 2 or 3 years, *191 and then to convert it to personal use. As anticipated, Mr. McKinsey took formal legal title to the BMW at the end of the lease, making a final payment in the amount of approximately $14,000. The total payments made under the lease agreement were somewhat in excess of $33,000. The parties have agreed that the open-ended lease agreement in this case was a conditional sales contract. The parties have further agreed that the amounts paid to First Leasing Corporation should be allocated $28,300 to the cost of the BMW and $5,155 to interest, $31 of which was deemed paid in 1977 and deductible in that year. During April and May 1977, petitioners resided in Mission Viejo, California, and Mr. McKinsey worked as a group vice president for U.S. Filter, which was located in Santa Ana, California. Mr. McKinsey traveled daily from his home to his office, a distance of approximately 10 miles. Mr. McKinsey's job required that he travel frequently to U.S. Filter's plants in Orange, California, a distance of about 15 miles from Santa Ana, and in Monrovia, California, a distance of about 90 miles from Santa Ana. Often, Mr. McKinsey would travel from the Orange and Monrovia plants to other locations *192 to call on customers before returning to his office. In addition, Mr. McKinsey at times traveled on business to Seattle, New York, Dallas, and Kansas City. When he made these long-distance trips, Mr. McKinsey would drive his BMW from his home to the airport, a distance of approximately 70 miles. When petitioners returned to New Canaan, Connecticut in late May 1977, Mr. McKinsey began working for Dolly Madison Industries (Dolly Madison). Dolly Madison had been in bankruptcy for a number of years, and it was Mr. McKinsey's job to help put the company "back on its feet." Dolly Madison had offices in various cities, including Philadelphia, Pennsylvania; New Albany, Indiana; Huntingburg, Indiana; Urbana, Illinois; Gettysburg, Pennsylvania; Dothan, Alabama; Crockett, Texas; and Louisville, Kentucky. In addition, it had showrooms in High Point, North Carolina; Dallas, Texas; and Atlanta, Georgia. When Mr. McKinsey began working for Dolly Madison it was uncertain which offices of the company were going to survive. Mr. McKinsey suggested to the company's trustee in bankruptcy and to the bankruptcy judge that it might be most beneficial to the company if he set up his office in his New *193 Canaan home, since the company would not have to incur expenses to move him to a new location. This suggestion was accepted as prudent, in light of the uncertain future of the company's various established offices. From the time petitioners moved back to New Canaan in late May 1977 through the end of that year, Mr. McKinsey worked out of a room set aside in his home. A typewriter, duplicating machine, telephone answering machine, and other office equipment were located in this room. Occasionally, a secretary from either the Huntingburg, Indiana or Philadelphia, Pennsylvania offices would travel to Mr. McKinsey's home office to take whatever dictation had to be done. At othertimes, Mr. McKinsey would travel to one of the other offices when he needed secretarial assistance. Between late May 1977 and the end of that year, Mr. McKinsey traveled on business to various of Dolly Madison's offices and showrooms. Mr. McKinsey visited the Huntingburg, Indiana Office most frequently. In addition, he traveled from his home office on business to meet with the company's trustee in bankruptcy, who was located in Philadelphia, Pennsylvania, with the company's bankers in New York, and with *194 one of the company's lenders, Prudential Insurance Company, located in New Jersey. Sometime around the end of 1977, Dolly Madison began renting office space on Cherry Street, New Canaan, Connecticut. Mr. McKinsey thereafter moved his office from his home to the Cherry Street location. The New Canaan office apparently became Dolly Madison's corporate headquarters for a period of about 3 years. Dolly Madison eventually closed all of its other offices, except for the Huntingburg, Indiana office. Mr. McKinsey used his BMW for his business travel during 1977. However, he kept no diary of the business use of the BMW during that year. Mrs. McKinsey owned a Fox (assumed to be an Audi) automobile during 1977. Petitioners often used the Fox for personal travel. Both Mr. and Mrs. McKinsey deducted automobile expenses on their 1977 return. Mrs. McKinsey deducted 50 percent of her automobile expenses as employee business expenses. Mr. McKinsey claimed automobile expenses as follows: Gasoline, oil, lubrication, etc.
$536 Repairs
562 Insurance
611 Leasing
8,849 Total
$10,358 Percentage of expense allocable to
business
80%
Business portion
[8] $8,286 Mr. McKinsey deducted $300 in sales tax on the automobile *195 transaction. [9] In his notice of deficiency, respondent disallowed "lease expense" in the amount of $8,038.41. Respondent based the foregoing proposed adjustment on information contained in a report prepared by the State of California Franchise Tax Board. In an August 20, 1979 Notice of Additional Tax Proposed to be Assessed, Form FTB 5830-M, the State of California Franchise Tax Board allowed petitioners a lease expense deduction of only $810.51, based on the Board's determination that petitioners resided in California for only 2 months of the lease's term. In their original petition, petitioners asseted that they properly deducted automobile lease costs only to the extent of the business use of the leased authomobiles and were entitled to the full amount deducted. In an amendment to their petition, petitioners asserted that, because Mr. McKinsey's open-ended lease contract *196 was a conditional sales contract, petitioners are entitled under section 167(a)to unclaimed depreciation deductions with respect to Mr. McKinsey's BMW in the amount of $11,320 and are also entitled under section 46(c) to an investment tax credit in the amount of $755. OPINION Petitioners contend that 80 percent of Mr. McKinsey's use of the BMW was for business purposes and thus that they should be entitled to a partial depreciation deduction and an investment tax credit based on an 80-percent business use allocation of the basis in the automobile.Petitioners further contend that they are entitled to use the double declining balance method of depreciation and that the BMW had a useful life of only 3 years. Respondent contends that Mr. McKinsey's use of his BMW was primarily personal in nature and thus that petitioners are not entitled to any depreciation deduction or investment tax credit with respect to the automobile. Respondent further contends that, even if petitioners are entitled to a depreciation deduction, they are not entitled to use the double-declining balance method of depreciation. Finally, respondent contends that the BMW had a useful life of 4 years. We turn first to *197 the issue of the business use of the car. At the outset we must dispose of some procedural questions raised on brief with respect to the business use issue. Petitioners maintain on brief that respondent has the burden of proof with respect to the business use allocation question. In support thereof, petitioners maintain that respondent's notice of deficiency did not disallow any expenses attributable to the BMW on the basis of a business use of less than 80 percent. Instead, according to petitioners, respondent merely questioned the proper characterization of the BMW leasing expense, per se. In addition, petitioners contend that respondent continued to accept throughout trial their 80-percent business use allocation for the gasoline, insurance, and repair expenses attributable to the BMW, but sought for the first time at trial to apply a lesser business use percentage allocation for depreciation and investment tax credit purposes.In sum, petitioners contend that the business use issue, to the extent that it affects their claimed entitlement to a depreciation deduction and an investment tax credit, is new matter on which respondent bears the burden of proof in accordance with Rule 142(a), Tax Court Rules of Practice and Procedure. *198 In his reply brief, respondent addresses himself to the foregoing contentions. Respondent asserts that his statutory notice disallowing $8,038.41 of the $8,286 claimed automobile business expenses did not indicate that respondent was not questioning the allocation issue. In fact, respondent suggests that it would have been premature to even raise the allocation issue since he was disputing the entire amount on the broader theory that the amounts deducted were not proper business expenses. Furthermore, respondent disputes petitioners' allegation that he has not contested the deductions for gasoline, insurance, and repair expenses claimed with respect to the BMW. We agree with respondent that the business use issue is not new matter on which respondent bears the burden of proof. Regardless of the original theory on which the deficiency determination was based, we conclude that the business use issue was tried by the consent of petitioners. Our conclusion is firmly based on the following colloquy, which took place at the end of the trial: Ms. Eure: [for respondent]: * * * The petitioners' attorney is trying to show that out notice of deficiency doesn't include an issue that we are *199 arguing here so we would like to amend * * * our pleadings to conform with -- The Court:--what do you mean? * * * Ms. Eure: * * * I believe he was trying to indicate that our notice of deficiency limits us solely to the issue of the $8,849 which appears on the return as a leasing expense and not any other issue concerning * * * personal use. * * * Mr. Jacobs [for petitioners]: That is not correct. * * * If that is part of your--if, indeed, that were part of your initial position and mine to the extent that we have amended the petition and are claiming depreciation based upon the purchase of the automobile, the amount of that depreciation is necessarily limited by the percentage of business use and the percentage of business use is in issue and it's been introduced by us and you obviously are in a position to resist that-- Mr. Eure: Fine. In light of the foregoing, we believe thatthe business use issue, as it relates to the claimed depreciation deduction and investment tax credit, is one on which petitioners bear the burden of proof. Conceptually, the business use issue is as relevant to the propriety of the claimed deductions for gasoline, insurance, and repair expenses as it is *200 to the propriety of the depreciation deduction and investment tax credit claimed in petitioners' amended petition. Respondent's statutory notice indicates that respondent disallowed $8,038.41 of the "lease expense." In fact, because petitioners claimed only 80 percent of the $8,849 leasing expenses, or $7,079.20, respondent's notice, to the extent it was intended to disallow only lease expenses and none of the other claimed automobile expenses, disallowed greater than the amount of the leasing expenses actually claimed. Respondent attempts to explain the discrepancy by asserting that he made a mathematical error in that the disallowance should have extended to the entire $8,286 claimed as automobile business expenses. According to respondent, the $8,038.41 figure was erroneously taken from the California Franchise Tax Board Report. Although we are inclined to agree with petitioners that respondent's original determination in his statutory notice did not specifically cover the claimed deductions for gasoline, insurance, and repair expenses, we nevertheless believe that the propriety of those deductions was necessarily tried as part and parcal of the business use issue and that petitioners *201 understood, or should have understood, such to be the case. We believe that petitioners' attorney, in effect, assured respondent that no amendment to the pleadings to cover these additional issues was necessary.Thus, although we do not intend to condone the less than admirable care with which the notice of deficiency was prepared, we conclude that the propriety of the claimed deductions for gasoline, insurance, and repair expenses are in issue to the extent that those deductions are affected by our conclusion with respect to the business use allocation issue. Having disposed of the procedural questions raised with respect to the business use issue, we turn now to the substantive merits of that issue. Section 167 provides, in part, for the allowance of a depreciation deduction with respect to "property used in the trade or business." It is fundamental that depreciation is determined by reference to basis. The parties in this case agree that petitioners' basis in the BMW is $28,300. Where property is used in part for business and in part for personal reasons, basis for purposes of calculating depreciation must be allocated between the two uses. Specifically, the amount of basis qualifying *202 for depreciation is limited by a percentage equal to the percentage of time the property is used for business purposes. Bussabarger v. Commissioner,52 T.C. 819, 829 (1969). Cf. section 1.167(a)-5, Income Tax Regs. It is petitioners' contention that Mr. McKinsey's BMW was used for business purposes 80 percent of the time and, hence, that 80 percent of the basis qualifies for depreciation. Mr. McKinsey did not keep a diary or a log of his business uses of the BMW during 1977. He testified, however, that, while living in California in April and May 1977, he drove the BMW approximately 4,000 miles.He further testified that the business use of the BMW included business trips to and from the airport, trips from his office in Santa Ana to U.S. Filter's plants located in Orange and Monrovia, and trips from these plants to meet with clients before returning to his office in Santa Ana. With respect to the use of the BMW after petitioners returned to Connecticut, it is petitioners' contention that their residence was Mr. McKinsey's principal place of business until the end of 1977, when Dolly Madison began renting office space on Cherry Street. Petitioners evidently included in their 80-percent *203 business use calculations round trips made by Mr. McKinsey to Dolly Madison's various offices and showrooms, as well as trips made to meet with the company's trustee in bankruptcy and the company's bankers and lenders. Mr. McKinsey testified that from the time he moved back to Connecticut until the end of 1977, he drove the BMW approximately 18,000 to 20,000 miles. Respondent contends petitioners have not shown that their business use allocation was proper and reasonable, since the only evidence in support thereof is Mr. McKinsey's self-serving statements at trial. Respondent further contends that petitioners' allocation is clearly erroneous because in their determination of the business usage of the car, petitioners included substantial usage which was personal in nature. This latter contention is built on the premise that Mr. McKinsey's residence was not his principal place of business and thus that Mr. McKinsey's use of the BMW in traveling from his residence to Dolly Madison's various offices and showrooms should be considered use of the automobile for commuting purposes. It has long been recognized that travel between one's residence and one's established place of business *204 is generally personal in nature. Section 1.162-2(e), Income Tax Regs.; Fausner v. Commissioner,413 U.S. 838 (1973); Commissioner v. Flowers,326 U.S. 465 (1946). On the other hand, travel between two or more established places of business or travel away from one's established place of business in the pursuit of that business is generally considered travel for business purposes. Steinhort v. Commissioner,335 F.2d 496 (5th Cir. 1964), affg. a Memorandum Opinion of this Court; Heuer v. Commissioner,32 T.C. 947, 953 (1959), affd. per curiam 283 F.2d 865 (5th Cir. 1960). It is true as respondent points out that petitioners have put forth little evidence to assist us in determining that Mr. McKinsey's principal place of business was his residence. The record does not clearly indicate the nature of the work done by Mr. McKinsey in his home office or the duration of the time he spent in his home office. Mr. McKinsey merely stated in conclusory fashion that he worked out of his home. At the same time, we do not believe that the record lends itself to the conclusion that any particular one of Dolly Madison's established offices or showrooms should be pinpointed as Mr. McKinsey's principal *205 place of business. We believe that the situation presented herein is susceptible to either of two conclusions, each of which yield identical results in this case. We conclude either that Mr. McKinsey's principal place of business was his home, as it was his sole fixed location of business, or that Mr. McKinsey had no principal place of business and, thus, that his permanent residence should be considered his "tax home" for purposes of determining business usage of his car. Cf. Rambo v. Commissioner,69 T.C. 920, 923-925 (1978); Dean v. Commissioner,54 T.C. 663, 667 (1970). In either situation, when Mr. McKinsey traveled between his home and Dolly Madison's established offices and showrooms or the offices of the company's bankers, lenders, and trustee in bankruptcy, he was not commuting and his use of the BMW was not personal in nature. Instead, such use of the BMW constituted business use of the automobile. Respondent's reliance on Green v. Commissioner,59 T.C. 456 (1972); Mazzotta v. Commissioner,57 T.C. 427 (1971), affd. per curiam 465 F.2d 1399 (2d Cir. 1972); and Smith v. Warren,388 F.2d 671 (9th Cir. 1968), is misplaced. Both Green and Mazzotta held, in effect, that *206 a taxpayer's expenses of traveling between his principal place of business and his home, where he maintained a secondary place of employment, were nondeductible commuting expenses. In Mazzotta, we found that the taxpayer's primary purpose for returning to his residence at the end of the working day was to be home (in the popular sense of the term), a purpose that was inherently personal in nature. In Green, we found that the taxpayer's reasons for maintaining a home office in addition to his regularbusiness office were motivated by personal preference and convenience and that his reasons for traveling from his regular office to his home office were purely personal in nature. By contrast, in the instant case, we do not believe that Mr. McKinsey had a principal place of business outside of his personal residence. Hence, we are not faced with a situation where a taxpayer is attempting to classify, as business usage, travel between a principal place of business and a secondary place of business located in his personal residence. In Smith v. Warren,supra, the Ninth Circuit held that a Puget Sound pilot's expenses incurred in traveling between his home and ships located within the central *207 Seattle waterfront were nondeductible personal expenses. Although the taxpayer maintained an office in his home and received assignments on his residential phone, the court held that the taxpayer's principal place of business was in Seattle, rather than in his home. In support thereof, the court noted that the taxpayer was a member of the Puget Sound Pilot Association, which maintained an office in downtown Seattle that conducted most of the office activities connected with the taxpayer's business. In addition, the court noted that the Seattle office was centrally located with respect to the taxpayer's piloting assignments, that the taxpayer was not required to remain at home to receive his assignments, and that any charts, tables, and books which the taxpayer kept at his home office were also available in the Association headquarters. The factual differences between the instant case and Smith v. Warren are sufficient to require a contrary result. In the Smith case it was relatively easy to pinpoint a principal place of business outside of the taxpayer's personal residence. In addition, the evidence indicated that the taxpayer maintained a home office primarily for personal reasons *208 and not for any reasons that served a significant function with respect to his trade or business. By contrast, as we have emphasized, the facts in the instant case do not lend themselves to a finding that Mr. McKinsey had a principal place of business outside of his home. Because Dolly Madison's offices and showrooms were spread throughout a number of states, it cannot be said that any particular office was geographically the central location of the company. Nor does it appear that any particular office engaged in substantial business activites on behalf of the entire company. While it may well be that Mr. McKinsey's suggestion that his "home base" for business purposes be located in New Canaan was motivated to some extent by personal preference and convenience, we believe that the decision to accept this suggestion was based on the determination that the New Canaan location would be equally beneficial to the company. At the time Mr. McKinsey began working for Dolly Madison, the company was in bankruptcy and the future of the company's established offices was highly uncertain. The company apparently incurred no extra costs as a result of having Mr. McKinsey work out of his home. *209 Furthermore, the fact that the company eventually rented office space in New Canaan and apparently established the New Canaan office as its headquarters for a period of about 3 years suggests that the New Canaan location was as desirable to the company as it was to Mr. McKinsey. Although we believe in light of our foregoing conclusions that Mr. McKinsey's BMW qualified as "property used in a trade or business" within the meaning of section 167, we do not believe that petitioners have carried their burden of proving that their 80-percent business use allocation was proper or reasonable. Mr. McKinsey kept no diary of the business use of the BMW during 1977 and presented us with no evidence on the issue other than his self-serving testimony that he used his BMW 80 percent for business and 20 percent for pleasure. Mr. McKinsey did not explain the basis for these calculations. He testified that he drove the BMW approximately 4,000 miles during April and May 1977,and approximately 18,000 to 20,000 miles from April through December 1977. However, he did not indicate whether these figures represented the total mileage driven or merely the business usage portion of the total mileage. *210 While we found Mr. McKinsey generally to be a credible witness, the record also establishes that he was far from shy when it came to claiming business expenses. We cannot accept his 80-percent business usage allocation. An income tax deduction is a matter of legislative grace, and the burden of clearly showing the right to the claimed decution is on the taxpayer. Interstate Transit Lines v. Commissioner,319 U.S. 590, 593 (1943); New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). Petitioners have not clearly established their right to a depreciation deduction based on an 80-percent business use allocation. Nevertheless, we are satisfied that petitioners are entitled to a depreciation deduction based on some business usage of the BMW. We must ourselves, therefore, allocate the personal and business usage, bearing heavily against petitioners because the inexactitude is of their own making. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). We conclude that 40 percent of the usage of the BMW in 1977 qualifies as business usage of the automobile and that petitioners are entitled to depreciate 40 percent of the basis thereof. Respondent contends that evenif petitioners *211 are entitled to depreciate a portion of the basis of the BMW, they are not entitled to use the double-declining balance method of depreciation. Section 167(c) provides, in pertinent part, that the declining balance method of depreciation shall only be used in the case of tangible property with a useful life of at least 3 years, which was "acquired after December 31, 1953, if the original use of such property commences with the taxpayer and commences after such date." Section 1.167(c)-1(a)(2), Income Tax Regs., in fleshing out the statute, states that the term "original use" means the first use to which the property is put, whether or not such use corresponds to the use of such property by the taxpayer. It is respondent's contention that petitioners have not shown that the property was new in use when they acquired it on April 1, 1977 under the open-ended lease agreement. Respondent raises this contention on brief. In their reply brief, petitioners allege that the question of whether the BMW was new when acquired by them is new matter and that respondent must point to some evidence in the record that suggests the BMW was not new when purchased. We believe that petitioners misapprehend *212 their situation. Petitioners have claimed that they are entitled to use the double-declining balance method of depreciation. Petitioners may not employ that method unless their use of the BMW was the firstuse to which the automobile was put. The burden of proof rests upon petitioners to sustain the depreciation deduction claimed. They must affirmatively establish the reasonableness of the depreciation deduction computed under the double-declining balance method through proof of the correct ultimate facts, including the fact that their use of the BMW was the first use to which the property was put. Petitioners have failed to do so. The record merely reveals that petitioners acquired the BMW on April 1, 1977 under an open-ended lease contract. There is nothing in the record from which to determine whether or not the BMW had been used prior to its acquisition by petitioners. Accordingly, petitioners have failed to meet their burden of proving that they are entitled to depreciate the BMW under the double-declining balance method. Finally, it is respondent's contention that the BMW had a useful life of 4 years because the automobile could reasonably be expected to be useful to Mr. *213 McKinsey for this period of time. Petitioners, on the other hand, claim that the automobile had a useful life of 3 years. Useful life, for purposes of determining depreciation deductions under section 167, is not necessarily the useful life inherent in an asset but is the period over which an asset may reasonably be expected to be useful to the taxpayer in his trade or business. Sec. 1.167(a)-1(b), Income Tax Regs.; Massey Motors, Inc. v. United States,364 U.S. 92 (1960). The burden rests with petitioners to prove that respondent's determination of the useful life of the BMW is erroneous. Casey v. Commissioner,38 T.C. 357, 381 (1962). Mr. McKinsey testified that he typically used his cars for business purposes "about three years, two to three years, not beyond three years." He further testified that when he entered into the open-ended lease contract, he expected to use the BMW in his business for about 3 years and then to convert it to personal use and that he did, in fact, convert the car to personal use "[a]t the end of three years, sometime in the fourth year when the lease was nearly over." In determining the anticipated useful life of an asset, taxpayers may properly rely *214 on their own experience. Section 1.167(a)-1(b), Income Tax Regs. While his testimony is not as lucid as we might have desired, we believe that Mr. McKinsey did in fact expect to use the BMW in his business for a 3-year period, as was his customary practice, and that his use of a 3-year useful life for depreciation purposes is reasonable. In sum, with respect to the depreciation issue, we conclude that petitioners are entitled to depreciate 40 percent of their basis in the BMW, that petitioners may not use the double-declining balance method of depreciation, and that petitioners may use a 3-year useful life in computing their depreciation deduction. Petitioners have claimed that they are also entitled to an investment tax credit under section 38 with respect to their acquisition of the BMW. Respondent contends that the BMW is not section 38 property as defined in section 48(a) because section 38 property includes only property with respect to which depreciation is allowable. In light of our conclusion that petitioners are entitled to depreciate 40 percent of the basis of the BMW, we conclude that 40 percent of the BMW qualifies as section 38 property and that petitioners are, therefore, *215 entitled to take that proportionate part of the automobile into account for purposes of determining the amount of credit allowable under section 38. Sec. 1.48-1(b)(2), Income Tax Regs.
Finally, as we stated earlier, we believe that petitioners' claimed deductions for gasoline, insurance, and repair expenses based on an 80-percent business use allocation are in issue in the instant case. We have concluded that petitioners have not proven that their 80-percent allocation was reasonable or proper and have reduced that allocation to 40 percent. This allocation is as equally applicable to the foregoing expenses as it is to the depreciation and investment tax credit. [10] To sum up, we are left with the definite impression that petitioners were overly aggressive in claiming business expenses and may fairly be described as having been guilty of overreaching. Decision *216 will be entered under Rule 155.
Footnotes
1. Mr. Peck subcontracted out some of the work. For purposes of simplicity we will not differentiate between the work that Mr. Peck did himself and the work done by the subcontractor.↩
2. In the stipulation of facts, the last invoice from Harry Peck, Builder is dated Dec. 29, 1977. However, the actual invoice itself, which was also stipulated into evidence, is dated Jan. 12, 1978.↩
3. In his brief, respondent also addresses the casualty loss deduction claimed on petitioners' return.While we are inclined to agree with respondent that the evidence presented does not establish that petitioners suffered a loss as a result of a casualty in 1977, we will not pursue the matter further in light of petitioners' apparent concession on brief.↩
4. We note that respondent argues that in no event are petitioners entitled to a deduction under sec. 162↩, because their rental activities did not amount to carrying on a trade or business. Since it will not affect the ultimate disposition of the overall deductibility issue, we will simply assume for purposes of discussion that petitioners were engaged in a trade or business by virtue of their rental activities.
5. Mr. McKinsey testified that Mr. Peck was able to determine the full extent of the damage only after he removed plaster from the walls and titles from the bathroom.Mr. McKinsey also testified that he grossly underestimated his insurance claim because at the time he notified the company, Mr. Peck had not yet taken the walls down. Clearly, then, much of the damage was latent even at the time petitioners returned to New Canaan.↩
6. See also Sheldon v. Commissioner,T.C. Memo 1961-44, affd. without discussion of this issue 299 F. 2d 48 (7th Cir. 1962), where under facts similar to those in Page v. Commissioner,1 B.T.A. 400 (1925), we held that certain "repair" expenses incurred after the taxpayer ceased holding property as rental property were incurred in readying the property for use as a personal residence and were, therefore, nondeductible. But cf. O'Madigan v. Commissioner,T.C. Memo. 1960-212, affd. without discussion of this point 300 F. 2d 154 (6th Cir. 1962), where a severe rainstorm caused damage to the taxpayer's house while the taxpayer was holding it as rental property. We there held that, because the damage had occurred while the property was being held as rental property, the taxpayer was entitled to deduct, under section 162 or section 212↩, one-half of the cost of repairs made after the taxpayer had resumed occupancy of the house.
7. Boger v. Commissioner,T.C. Memo. 1963-137↩.
8. We note that the calculations appearing on the return contained mathematical errors in that the "Total" expenses add up to $10,558, as opposed to $10,358, and "Business portion," therefore, becomes $8,446.40, as opposed to $8,286. ↩
9. Respondent concedes that petitioners are entitled to a sales tax deduction of $300.↩
10. We note that respondent has not contended that the substantiation requirements of section 274(d) bar the deduction of any of the foregoing expenses, and considering the circumstances under which we have extended the business use issue to those expenses, we are not inclined to consider the possible application of that section.↩